Agnes, A.J.
This is a civil action in which the plaintiffs seek injunctive relief against the defendants, Mayor Edward Clancy (“Mayor”) and the City of Lynn (“City”), to prevent them from going ahead with plans to lay off certified, Emergency 911 Call-Takers, who serve as civilian employees of the City, and to replace them with existing, sworn members of the city’s Police Department.
I. BACKGROUND
The essential facts are not in dispute. It is a matter of public record and an appropriate subject for judicial notice, that Massachusetts, like many other states, is in the midst of a severe fiscal crisis due to a rapid decline in tax revenues during the past several years. Despite the Legislature’s prescient judgment, made a number of years ago, to create a “rainy day” fund and to deposit funds accumulated during years of revenue growth into it, and various initiatives to reduce or slow the growth in certain areas of state spending, the revenue shortfall has grown worse. By late 2002, it was apparent that state leaders would be required to make deep cuts in state spending during this current fiscal year to maintain a balanced budget.[1] Because the state, unlike the federal government, cannot close the books on its fiscal year with a budget deficit, in January 2003, the Governor and the Legislature reached an agreement on the magnitude of the fiscal problem, and took decisive steps to reduce state spending to insure that the budget gap would be closed by June 30th, the end of the state’s fiscal year.
One measure involved cuts in local aid that were ordered by the Governor, under special authority conferred on him by the Legislature. This local aid cut resulted in a loss of nearly 2.5 million dollars by the defendant City of Lynn in the current fiscal year. Affidavit of Mayor, paragraph 11. The impact of this cut is even greater because it was ordered midway through the fiscal year. Furthermore, as the Mayor’s affidavit points out, the defendant City of Lynn is under an obligation, under a special state law known as the “Bailout Act” of 1985, St. 1985, c. 8, to insure that city departments not spend more than the amounts allotted to them under the city’s annual budget. According to the Mayor’s affidavit, the city’s Fire Department has been expending monies this year at a rate in excess of what has been allotted to it. At the current rate of spending, the city’s Fire Department will overspend its budget for the current fiscal year. This problem is exacerbated by the cuts in local aid that were made by the Governor in January 2003.
The individual plaintiffs are residents of the city and civilian employees of the City who work as Emergency 911 Call-Takers. There are approximately 35 of these Call-Takers employed by the city. See Plaintiffs’ Verified Complaint, paragraph 3. These Call-Takers receive emergency E911 telephone calls for assistance by persons in need throughout the city. The Call-Takers have numerous responsibilities including the duty to identify medical problems, to obtain the caller’s address, to dispatch emergency services, to provide pre-arrival instructions, instruct on CPR, to remain on the phone with distraught callers until assistance arrives, and employ “calming techniques” to reduce the callers stress level, to provide assistance with child birth, and to provide instructions about certain types of injuries or medical conditions. See Plaintiffs Verified Complaint, paragraph 12; Affidavit of plaintiff Kim Doucette, paragraph 3. The Call Takers do not respond to the scene of any emergency, but rather they obtain information, give instructions or provide assistance over the telephone, and, when appropriate, refer the call to the Police dispatch or the Fire dispatch. The plaintiff Call Takers are certified by the Statewide Emergency Telecommunications Board. Plaintiffs Verified Complaint; Affidavit of plaintiff Kim Doucette,
Due to the cify’s fiscal problems, the defendant Mayor was forced to make budget cuts in all city departments during the middle of the fiscal year. Because the rate of spending by the Fire Department was in excess of what had been proposed by the city earlier in the year, the funds remaining in its allotment for the year are not sufficient to make up the contribution that the Mayor determined should be made by the Fire Department to balance the city’s budget. Mayor’s Affidavit at paragraph 15. The defendant Mayor determined that it was necessary to lay off the approximately 30 Call Takers from the City’s payroll to create the revenue that is required to balance the budget and to ensure sufficient funds for Fire Department operations for the remainder of the fiscal year. On March 3, 2003, before taking this action, the city gave notice to the civilian Call Takers that their positions would be eliminated effective on March 28, 2003. Affidavit of Francis A. Castle, City Personnel Director. The defendant city and the plaintiff union met before the notice sent on March 3rd, and again on March 12, 19, and 21, 2003 to discuss the impending layoffs, and whether it would be possible to avoid them. Active negotiations took place over the possibility of a furlough program to delay some or all of the impending layoffs, but no agreement has been reached. Affidavit of Francis A. Castle, City Personnel Director. The defendant city has expressed its willingness to continue the negotiation.[2]
*160 The Mayor’s decision to lay off Call Takers was based on a determination that positions of Call Takers “were redundant in that these same duties were already being performed by dispatchers of the Lynn Police Department and Fire Alarm operators,” Mayor’s Affidavit, paragraph 20, that “the elimination of the civilian Call takers position could be effectuated without any increase in costs to the Ciiy of Lynn,” Mayor’s Affidavit, paragraph 21, and that “the elimination of the civilian Call Takers positions could be effectuated without any reduction in public safely and with no increased threat to the health, safety, and welfare of the citizens of the City of Lynn.” Mayor’s Affidavit, paragraph 22.[3]
The Mayor further states that if the court enjoins him and the city from laying off civilian Call Takers, he will be forced to lay off uniformed fire fighters and police officers, who perform crime prevention and investigation duties, and fire suppression and life saving services for the people of the city, and that the impact of this decision would be more adverse to the city and its people than the impact of laying off civilian Call Takers. Mayor’s Affidavit, paragraphs 23-26. The Mayor also states that if the court enjoins him and the city from laying off civilian Call Takers, it is likely that the city will not succeed in balancing its budget and will be in violation of the mandate of St. 1985, c. 8.
The city has developed a plan for how to sustain its E911 responsibilities without the services of the civilian Call Takers. According to the first affidavit submitted by Kevin Coppinger, Deputy Police Chief of the city, the duties of Call Takers have been assumed by uniformed police officers who have also been certified by the Statewide Emergency Telecommunications' Board. These officers either will dispatch appropriate police assets to the scene of the emergency, or transfer the call to the Fire dispatch for action by that department. The city has also made arrangements for 15 of these police officers to obtain an additional certification in Emergency Medical Dispatch by the end of this month. This is more than the number of civilian Call takers who have this certification. Neither of these certifications is a legal requirement for the performance of the duties of a Call Taker. Prior to the employment of civilian Call Takers, emergency calls were handled directly by police officers. See Affidavit #2 of Deputy Chief Pottinger (detailing the role of the police department in responding to emergency calls before the implementation of E911, proving an analysis of the nature of the E911 calls received by the ciiy [predominantly police-oriented], and the procedures involved in responding to E911 calls). According to Deputy Chief Coppinger, Lynn “[p]olice officers are trained to deal with medical emergencies as these officers are required to attend the Police academy and to attend annual in-service training.” Coppinger Affidavit #1, paragraph 12.
II. DISCUSSION
1. Legal Standard Applicable to Request for a Preliminary Injunction
On a number of occasions, the Supreme Judicial Court has explained the standard governing requests for injunctive relief. “This standard requires that, through an abbreviated presentation of the facts and the law.. . the moving party must show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits. At the same time, the party opposing the injunction may make a similar showing of irremediable harm which would occur were the injunction to issue. The task for the motion judge is to balance the risk of irreparable harm to the plaintiff and defendant ”in light of [each] party’s chance of success on the merits at trial. Only where the balance between these risks cuts in favor of the moving party may a preliminaiy injunction properly issue." Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990), quoting Packaging Indus. Group v. Cheney, 380 Mass. 609 (1980). “Where a public entity is a party, a judge may weigh the risk of harm to the public interest when deciding a preliminary injunction motion.” Bank of New England, N.A. v. Mortgage of New England, 30 Mass.App.Ct. 238, 246 (1991), discussing Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
2. The Likelihood of Success Requirement
The thrust of the plaintiffs complaint is that (1) the defendant Mayor and city acted unlawfully in making the decision to lay off civilian Call Takers by not first engaging in impact bargaining, and (2) that they acted arbitrarily and capriciously, and as a result have created a public safety emergency in the city of Lynn.
(1) The claim that the defendants acted unlawfully by not first engaging in impact bargaining is not supported by the record. The affidavit submitted by Mr. Castle details the series of meetings held between the ciiy and the union both prior to the notice of lay offs and subsequent to the notice. The city maintains (without refutation by the plaintiffs) that during these negotiations, the union offered a plan under which furloughs would be taken by the civilian Call Takers in order to avert the lay off of 24 union members before July 1, 2003. The City, in turn, offered to accept a city-wide furlough program involving all employees represented by the union. Up to this point, no agreement has been reached. The essence of good faith bargaining, however, is not agreement, but an honest effort to reach an agreement. In view of the fact that discussions have taken place between the union and the city, that alternative solutions have been proposed by each side that each appear to be, on their face, reasonable, that it is understandable why each side might prefer its own proposal and be unwilling to accept the proposal offered by the other side, it is not possible to say that the plaintiffs have demonstrated *161 a reasonable likelihood of success on their claim that the city has violated G.L.c. 150E by failing to bargain over the impact of layoffs.
(2) The claim that the defendants acted arbitrarily and capriciously is also not supported by the record. The power of judicial review is not available to second guess the discretionary actions taken by municipal officials acting in good faith, especially when their decisions involve a consideration of how best to allocate available resources among municipal departments in a time of severe fiscal crisis. See Slocum v. Medford, 302 Mass. 251, 254 (1939).[4] This is the type of administrative action that lies at the heart of the discretion entrusted to the Mayor by the electorate. Nonetheless, courts do have the power and the duty to intervene in municipal affairs in those rare circumstance where municipal officials establish a policy on the basis of bad faith, or in an arbitrary or capricious manner. Neither ground is presented by the facts before me.
The record supports the defendants’ position that they acted in good faith on the basis of legal imperatives to reduce spending in the City of Lynn by nearly 2.5 million dollars during the second half of this fiscal year. The Mayor’s decision to spread the necessary cuts throughout the city’s various departments appears to be eminently fair and reasonable in view of the fact that the city is responsible for providing residents and visitors to the City of Lynn with a variety of essential services including education, public safety, public health, and other regulatory and administrative services. A decision to impose the cuts entirely in any one area of city services could lead to a significant or total reduction in the city’s ability to deliver one of these vital services.
The plaintiffs do not challenge the general approach taken by the Mayor to balance the city’s budget. In terms of the Fire Department, the Mayor faced the added problem of implementing cuts in a department that was already on a trajectory to overspend its budget. The record before me permits the inference that the cost cutting plan developed by the Mayor, coupled with the requirements of the “Budget Bailout” act of 1985, led him to the conclusion that it was necessary to order layoffs of Ciiy employees in order to generate the savings necessary to avoid overspending by the Fire Department. The Mayor appears to have made a difficult decision to prefer what he regarded as the lesser of two evilsthe lay off of civilian Call Takers as opposed to fire fighters. There are ample reasons set forth in the affidavits filed by the Mayor, and Deputy Police Chief Coppinger which support the conclusion that this decision was reached only after discussions with the impacted employees and a consideration and assessment of the impact on the public health and safely of the residents and visitors to Lynn that would result from layoffs of civilian Call Takers as opposed to fire fighters. The plaintiffs have failed to demonstrate that the decision made by the Mayor was the result of bad faith, arbitrariness or caprice. Therefore, it is not for this court to inquire any further into the wisdom or the advisability of the cost cutting measures undertaken by the defendants.
3. The Plaintiffs’ Burden to Demonstrate Irreparable Harm
“A plaintiff experiences irreparable injury if there is no adequate remedy at final judgment. See Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L.Rev. 525, 551 (1978). In determining the harm to the plaintiff, the court need consider only the harm that would not be redressed by final relief. Id. at 541. In awarding preliminary injunctive relief, a court is justified in requiring the plaintiff to bear a slightly heavier burden, given the problems of enforcing injunctions. See id. at 547.” GTE Products Corp. v. Stewart, 414 Mass. 721, 724 (1993). Public employees who are discharged in violation of the law generally have an adequate remedy at law because if they prevail on the merits they are entitled to reinstatement and an award of back pay. See Ashford v. Massachusetts Bay Transp. Authority, 421 Mass. 563, 564 (1995).
4. Balancing of the Potential Harms and Consideration of the Public Interest
In a case such as this, it is appropriate to consider the public interest in determining whether to grant injunctive relief. See Bank of New England v. Mortgage Corp. Of New England,, 30 Mass.App.Ct. 238, 246 (1991) (“Where a public entity is a party, a judge may weigh the risk of harm to the public interest when deciding a preliminary injunction motion”), and cases cited. On the record before me, the plaintiffs have failed to demonstrate that the decision to assign sworn members of the city’s Police department to call taking duties for purposes of the city’s E911 system will pose any greater risk of harm, injury or death to the residents and visitors to the City of Lynn than currently exists with civilian Call Takers. Moreover, on the record before me, the public interest favors the position of the defendants. While the work performed by the civilian Call Takers in handling E911 calls bears a direct relationship to the safety and well being of the residents and visitors to the City of Lynn, and while there is no reason to suppose that they do not perform their duties in accordance with the highest standards of fidelity and competence, the affidavits filed by the defendants demonstrate that the lay off of fire-fightersaccording to the defendants the only other viable policy choice that is availablewould create an immediate danger of harm to the residents of Lynn.[5]
ORDER
For the above reasons, the motion for a preliminary injunction is DENIED.

 For example, According to the Massachusetts Taxpayers Foundation (“MTF”), an independent, non-partisan organization focusing on state spending, tax policies, and the Massachusetts economy, “[t]he Commonwealth is in the midst of its *162 worse fiscal crisis in more than half a century . . . [due to a combination of declining revenues and increased spending, there is] a widening gap in the state’s finances in 2003which has resulted in a series of mid-year gubernatorial spending reductionsand a projected $2 to $3 billion budget deficit in 2004.” State Budget ‘03: The Peifect Storm . . . Unleashed, Report of the Massachusetts Taxpayers Foundation (January 2003). This report and other analyses of the state’s fiscal problems is available at the MTF web page at www.masstaxpayers.org.

 In their verified complaint, paragraph 28, the plaintiffs maintain, without any supporting documentation or evidence, that the defendant city has not bargained over the elimination of the Call taker positions. The plaintiffs have not countered Mr. Castle’s specific assertions to the contrary. Although there may be a factual dispute between the parties, the plaintiffs have not framed it so as to permit the court to evaluate it in the context of the requirements of G.L.c. 150E. The record before me supports the Mayor’s and city’s assertion that they have bargained in good faith over the impact of these lay offs.

 In their verified complaint, paragraphs 17-23, the plaintiffs assert, with no supporting documentation or back-up, that the city’s police officers are not certified or trained to perform E911 duties, and that unless the plaintiff Call Takers remain on the job the city, its residents and visitors will be at risk, and “death, unwarranted delays and unwarranted pain and suffering” will result. On the record before me, including the evidence that only certified police officers will be assigned to E911 duties, this prediction is based on nothing more than speculation and offers no support for the plaintiffs’ position.

 “Ordinarily courts of equity will not interfere to decide questions committed by law to the determination of public officials. The court has no authority to take from such officers the duty of deciding the questions submitted to them and in the absence of illegal or arbitrary action their conclusions as to matters of fact within their jurisdiction cannot be controverted.” Capuano, Inc. v. School Bldg. Committee of Wilbraham, 330 Mass. 494, 496 (1953) (citations omitted).

 At oral argument, counsel for the defendants pointed out that if an injunction issued in the plaintiffs favor with only slightly more than three months remaining in the fiscal year, the number of police officers or fire fighters who would have ‘ to be laid off would be far in excess of the number of civilian Call Takers facing lay offs as a result of the action taken by the defendants earlier this month.